IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MILTON BOYER and KATHY BOYER,

                              Plaintiffs,                    OPINION AND ORDER

         v.
                                                             14-cv-286-wmc
WEYERHAEUSER COMPANY, and METROPOLITAN
LIFE INSURANCE COMPANY,

                              Defendants.
------------------------------------------------------------------------------------------------------------------------
BRIAN HECKEL, *Individually and as Special
Administrator on behalf of the Estate of Sharon Heckel*,



                              Plaintiff,

         v.
                                                             13-cv-459-wmc
CBS CORP., GENERAL ELECTRIC CO.,
METROPOLITAN LIFE INSURANCE
COMPANY, and WEYERHAEUSER COMPANY,

                              Defendants.
------------------------------------------------------------------------------------------------------------------------

DIANNE JACOBS, *Individually and as Special
Administrator on behalf of the Estate of Rita Treutel*,

                              Plaintiff,

         v.
                                                             12-cv-899-wmc
RAPID AMERICAN CORPORATION, and
WEYERHAEUSER COMPANY,

                              Defendants,

RAPID AMERICAN CORPORATION,

                              Cross-claimant,

         v.

WEYERHAEUSER COMPANY,
                              Cross-defendant.
------------------------------------------------------------------------------------------------------------------------

KATRINA MASEPHOL, *Individually and as Special Administrator on behalf of the Estate of Richard Masephol*,

                    Plaintiff,

         v.

                                                          14-cv-186-wmc

WEYERHAEUSER COMPANY, and METROPOLITAN LIFE INSURANCE COMPANY,

                    Defendants.

----------------------------------------------------------------------------------------------------------------------

JANET PECHER, *Individually and as Special Administrator on behalf of the Estate of Urban Pecher*,

                    Plaintiff,

         v.

                                                          14-cv-147-wmc

WEYERHAEUSER COMPANY, and METROPOLITAN LIFE INSURANCE COMPANY,

                    Defendants.

----------------------------------------------------------------------------------------------------------------------

VIRGINIA PRUST, *Individually and as Special Administrator on behalf of the Estate of Valmore Prust*,

                    Plaintiff,

         v.

                                                          14-cv-143-wmc

WEYERHAEUSER COMPANY, and METROPOLITAN LIFE INSURANCE COMPANY,

                    Defendants.

----------------------------------------------------------------------------------------------------------------------

JANICE SEEHAFER, *Individually and as Special Administrator on behalf of the Estate of Roger Seehafer*,

                    Plaintiff,

         v.

                                                          14-cv-161-wmc

WEYERHAEUSER COMPANY,

                    Defendant.

----------------------------------------------------------------------------------------------------------------------

2

THERESA SYDOW, *Individually and as Special Administrator on behalf of the Estate of Wesley Sydow,*

                            Plaintiff,

        v.

                                                            14-cv-219-wmc

WEYERHAEUSER COMPANY, and METROPOLITAN
LIFE INSURANCE COMPANY,

                            Defendants

---

The above-listed eight cases all involve nuisance claims brought by or on behalf of the estates of now deceased, former workers of defendant Weyerhaeuser Company and their spouses for asbestos-related injuries based on alleged, *non*-occupational exposure.  In each case, defendant Weyerhaeuser has moved to strike plaintiffs' experts and for summary judgment, arguing that plaintiffs are unable to prove injuries beyond those resulting from asbestos exposure on the job, for which they, their estates and spouses may only recover under worker's compensation laws.  While the motions for summary judgment raise other bases for dismissal of plaintiffs' claims, most of the issues raised in the summary judgment motions overlap with those raised in defendant's *Daubert* motion, which challenges the admissibility of expert testimony that non-occupational exposures constituted a substantial contributing factor in the plaintiffs' respective development of asbestos-related diseases.[1]

For the reasons that follow, the court will grant defendant's *Daubert* and summary judgment motions with respect to plaintiffs Masephol, Prust, Seehafer, Heckel and Treutel, based on their failure to offer reliable evidence of significant, non-occupational

---

[1] Six of the eight workers were diagnosed with mesothelioma, while the other two were diagnosed with lung cancer.

exposure to asbestos.  The court will, however, deny the same motions with respect to plaintiffs Boyer, Pecher and Sydow, finding that the latter three plaintiffs have produced sufficient evidence for a reasonable jury to find:  (1) they not only worked, but lived for at least one year within a 1.25 mile radius of the plant that scientific studies suggest may meaningfully increase their risk of development mesothelioma; and (2) a qualified expert can testify reliably that this exposure constituted a significant, non-occupational asbestos exposure, which in turn substantially contributed to their respective mesothelioma diagnoses.  The court will also grant defendant's motion for summary judgment on plaintiff's private nuisance claims, finding:  (1) plaintiffs failed to put forth any evidence of a possessory interest; and (2) the discovery rule under Wis. Stat. § 893.52 does not apply.  In all other respects, defendant's motions will be denied.

PRELIMINARY ISSUES

Before turning to defendant's motions for summary judgment and exclusion of experts, the court will first address a number of evidentiary and discovery-related challenges.

**A.  D.B. Allen's Document and Deposition**

In responding to defendant's motion for summary judgment, plaintiffs rely extensively on a 32-page document titled "Marshfield: An Environmental History," purportedly authored by D. B. Allen, dated August 1975.  (Herrick Decl., Ex. 1 (dkt. #360-1).)  Plaintiffs represent that this document was produced by Weyerhaeuser in 2003, as part of a separate asbestos lawsuit in which Weyerhaeuser was also a named

4

defendant.  The document consists of a chronology of entries concerning dust handling, complaints about emissions from community members, and various measurements of emissions, among other related topics and spans the time period from 1959 to July 10, 1975.

Defendant Weyerhaeuser seeks to strike this document from the record, asserting that it was not authenticated and does not fall under any of the exceptions to the rule of hearsay.  (Def.'s Mot. to Strike Pls.' Evidence as Inadmissible Hearsay ('286 dkt. #399) 2.)  Weyerhaeuser further contends that the document contains *multiple* layers of hearsay, since it "appears to include statements from other documents about statements purportedly made by members of the Marshfield community."  (*Id.*)

Plaintiffs not only oppose defendant's motion, but filed their own motions concerning Allen and this document.  First, plaintiffs contend that the document was properly authenticated by *defendant* in failing to respond to plaintiffs' request to admit.  (Pls.' Resp. ('286 dkt. #419); Pls.' Mot. to Deem Responses Admitted ('286 dkt. #420).)  Specifically, plaintiffs contend that Weyerhaeuser failed to respond timely to plaintiffs' requests for admission that certain documents produced by Weyerhaeuser, including the D. B. Allen chronology, "was a true and correct copy of the original so as to dispense with any foundational authentication requirements of the Federal Rules of Evidence."  (Pls.' Resp. ('286 dkt. #419) 2 (quoting Pls.' Requests for Admission ('286 dkt. #420-3) 3, 39).)

In fairness, plaintiffs concede that defendant Weyerhaeuser *did* respond to plaintiffs' requests for admission, denying the authenticity of certain documents,

including the D. B. Allen document.  (Def.'s Resp. to Pls.' Requests for Admission ('286 dkt. #420-4) 6.)  Plaintiffs nevertheless contend that the response was untimely by one day.  Plaintiffs' motion depends at the outset on plaintiffs' serving the requests for admission on July 29, 2015, while at least one of the certificates of service lists July 30, 2015, as the actual service date.  While plaintiffs offer compelling evidence that the requests for admission were actually served on the 29th, defendant could reasonably have relied on the latter date in serving its responses in light of the acknowledged discrepancy on the certificate of service.  Accordingly, the court will deny plaintiffs' motion to deem requests for admission admitted.

In the alternative, plaintiffs contend that the document may be properly authenticated as an ancient document.  Federal Rule of Evidence 901(b)(8) provides:

> **(8) Evidence About Ancient Documents or Data Compilations.**  For a document or data compilation, evidence that it:
>
> (A) is in a condition that creates no suspicion about its authenticity;
>
> (B) was in a place where, if authentic, it would likely be; and
>
> (C) is at least 20 years old when offered.

While the court is sympathetic to plaintiffs' predicament, there is no way for plaintiffs to demonstrate that the document "was in a place where, if authentic, it would likely be," having received the document from a prior lawsuit some 12 years ago, without *any* information as to where the document was stored before Weyerhaeuser's purported production of it.  As such, plaintiffs cannot authenticate the document for purposes of

summary judgment -- even putting aside the hearsay issue.  Still, plaintiffs *may* be able to introduce the document at trial.

In yet another related motion, plaintiffs seek an order permitting them to depose David B. Allen, a retired employee of Weyerhaeuser, whose last known position was assistant director of the Environmental Resources Group.  (Pls.' Mot. to Take Deposition of David B. Allen ('286 dkt. #417).)  Plaintiffs explain that they learned the identify of D. B. Allen more than two years before the close of discovery, but did not learn of his whereabouts until September 10, 2015, after the close of discovery, despite their earlier efforts to do so.  Plaintiffs contend that the delay in their receipt of his location constitutes good cause under Rule 16 to permit plaintiffs to depose Allen after the close of discovery.

In response, defendant points to its July 2015 answer to plaintiffs' interrogatory requesting contact information for certain former employees, including Allen, which stated that it would not provide information absent an authorization from the individual. Of course, defendant's response presents a classic chicken and egg conundrum:  how could plaintiffs obtain Allen's authorization to disclose his contact information without the requested contact information?  While plaintiffs perhaps could have, indeed should have, been more diligent in pressing for Allen's contact information, the court finds defendant's response constitutes good cause for extending the deadline for plaintiffs to depose Allen, though the deposition will be limited to questions concerning the 1975 D. B. Allen document.[2]

---

[2] Given that Allen likely falls outside of this court's subpoena power, plaintiffs may wish to

Finally, as for Weyerhaeuser's contention that the document should be excluded as hearsay, the court will reserve on that ruling pending Allen's deposition and any testimony on his part, which may after all demonstrate that the document falls within an exception to the hearsay rule, e.g., as an opposing party's statement, Fed. R. Evid. 801(d)(2), or as a business record, Fed. R. Evid. 803(6).[3]

### B.  Plaintiffs' Reliance on Depositions From Other Cases

In addition to seeking to strike the Allen document, Weyerhaeuser objects to plaintiffs' reliance on depositions from other cases, including at least one where Weyerhaeuser was not a defendant or otherwise involved in the case or deposition. (Def.'s Mot. to Strike Inadmissible Hearsay ('286 dkt. #399).)   Specifically, Weyerhaeuser objects to plaintiffs' reliance on the depositions of Elwood Schiller, Larry Rogers, Verna Fohrman, and Jerry Saindon, all but one of whom have since passed away and, therefore, are no longer available for live testimony or another deposition. Weyerhaeuser also represents that it was not present at the depositions of Schiller and Rogers, and that it was not a party in the action for which Schiller was deposed.

As an initial matter, while Weyerhaeuser lumps Saindon into its motion to strike, neither of the reasons offered for doing so -- that Weyerhaeuser was not present at the deposition or that the deponent is no longer available -- apply to Jerry Saindon.  (Pls.'

---

videotape the deposition, so that portions might be played during trial, if necessary.

[3] Despite not considering the D.B. Allen document at summary judgment, plaintiffs still put forth sufficient evidence of asbestos emissions into the community to survive summary judgment. Furthermore, it does not appear that plaintiffs' experts Frank Parker and Henry Anderson relied on the D.B. Allen document in forming their respective opinions.

Resp. ('286 dkt. #419) 7-8.)  Absent some reason for striking his deposition testimony, Weyerhaeuser's motion is denied with respect to Saindon.[4]

As for the other three individuals, there is no dispute that all three deponents are deceased and, therefore, unavailable under Rule 804.  The rule provides in pertinent part that:

> **(b) The Exceptions.**  The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> **(1) Former Testimony.**  Testimony that:
>
> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> (B) is now offered against a party who had--or in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b).

Since Weyerhaeuser was represented by counsel at the deposition of Verna Fohrman, with similar motive to develop the record, Rule 804(b) plainly applies to the admissibility of her deposition testimony in this action.[5]  Further, Weyerhaeuser was a defendant in the Rogers action and provided notice of Larry Rogers deposition, but chose

---

[4] Given this ruling, the court need not reach plaintiffs' apparent suggestion that portions of Saindon's 2003 deposition may be offered as a prior inconsistent statement from his 2014 deposition testimony under Federal Rule of Evidence 801(d)(1)(A).

[5] In addition, Weyerhaeuser also contends that Fohrman's deposition should be stricken because portions of her testimony contain hearsay or are not based on personal knowledge.  While the court will consider specific objections to those portions of her testimony in reviewing plaintiffs' proposed findings of facts, the court obviously would not strike the entire deposition based on the possibility that certain excerpts may be inadmissible.

not to appear.  As such, Weyerhaeuser had the "opportunity" and apparently the same motive to cross-examine him in 2001 while still available, but chose to pass on that opportunity.  The court, therefore, concludes that Rogers' deposition testimony is also admissible here.

The admissibility of Schiller's testimony presents a closer question.  Weyerhaeuser was neither a defendant in that action, nor present at his deposition.  Nor is there any suggestion that it was provided an opportunity to examine him, but chose not to do so.  Plaintiffs direct the court to a District of Massachusetts opinion in which the court allowed deposition testimony of a deceased co-worker in an asbestos action even though the defendant was not a participant in the prior action and was not present at the co-worker's deposition, reasoning that "the use of asbestos products on the site was thoroughly examined" by the nineteen lawyers who deposed that one witness.  *Barraford v. T&N Ltd.*, 988 F. Supp. 2d 81, 85 (D. Mass. 2013).

While the *Barraford* court's logic and sense of fairness is sound, the holding itself ignores the express requirement in Rule 804 that the party against whom the deposition is being offered is the *same* party, or a predecessor in interest to the party in a civil context, that was involved in the earlier deposition.  *See generally* 5 Mark S. Brodin *et al.*, Weinstein's Fed. Evidence § 804.04[4][a] (2d ed. 2015).  Moreover, this is a requirement that the Seventh Circuit at least has applied in a straightforward fashion.  *See United States v. Sklena*, 692 F.3d 725, 730-31 (7th Cir. 2012) ("[I]n order for Rule 804(b)(1)'s exception to apply, the hearsay testimony at issue must meet the criteria spelled out in the rule. That is, the party against whom the  evidence is being offered must have been

involved in the earlier 'trial, hearing, or lawful deposition,' and that party must have had an opportunity as well as a similar motive to develop the testimony at the prior proceeding."). Accordingly, the court will exclude Schiller's deposition as inadmissible hearsay.

### C. Weyerhaeuser's Motion for Protective Order concerning Ehlke Deposition

Finally, the court must address Weyerhaeuser's motion for a protective order up front, which seeks to prohibit plaintiffs' deposition of Douglas B. Ehlke, Weyerhaeuser's former in-house counsel, on the basis that "any information Plaintiffs seek from Mr. Ehlke is protected by the attorney-client privilege and/or attorney work product doctrine." (Def.'s Mot. ('286 dkt. #309); Def.'s Br. ('286 dkt. #310) 2.) As plaintiffs point out in their response, Weyerhaeuser relies in its motion on an Eighth Circuit case focused on protecting *trial* counsel from discovery, not in-house counsel at issue here. (Pls.' Resp. ('286 dkt. #386) 3-4.) Instead, plaintiffs represent that they will not ask Ehlke about any legal advice he rendered to the company, but rather the deposition will focus on his "knowledge of the documents and personnel involved with the asbestos matters during his tenure." (*Id.* at 2.)

Weyerhaeuser has failed to raise any basis -- and the court can find none -- for prohibiting plaintiffs from taking Ehlke's deposition. Perhaps the deposition will touch on information for which privilege is properly invoked, perhaps not, but plaintiffs suggest other topics which appear to fall outside the scope of any privilege, at least as it concerns his personal knowledge or knowledge obtained in a setting outside the scope of rending

11

legal advice or where that privilege was waived (*e.g.*, shareholder or other public meetings, court, SEC or other governmental submissions, or other discussions at which third-parties were present). The court will, therefore, deny Weyerhaeuser's motion for protective order, and allow plaintiffs to depose him on non-privileged matters.[6]

### D. Challenge to Anderson's Apportionment Opinion

Finally, defendant brings a motion to strike Anderson's "causation 'calculation' or 'risk assessment' theory and opinion" disclosed for the first time during the second day of his deposition. (Def.'s Mot. to Strike Testimony of Dr. Henry A. Anderson ('286 dkt. #302).) The only written evidence of this opinion is Anderson's handwritten calculations on each plaintiff's exposure summary, which was not even provided to defendant's counsel until the conclusion of the second day of the deposition. More importantly, Anderson did not disclose this theory in his final expert reports, as required by the court's preliminary pretrial conference orders. Moreover, as far as the court can discern, plaintiffs never sought to supplement Anderson's report with this new opinion.

Perhaps recognizing their tenuous position, plaintiffs' response to this motion is limited to a footnote in their brief in opposition to defendant's *Daubert* motion. In that footnote, plaintiffs argue that the opinions are not new, but rather "Dr. Anderson merely clarified and made more specific his earlier answers when probed." (Pls.' Opp'n ('286 dkt. #359) 60 n.48.) Not true. Anderson testified at his deposition that he was

---

[6] Because the court is denying defendant's motion, it need not consider plaintiffs' motion for leave to file a sur-reply, nor did it consider the proposed sur-reply. (*See, e.g.*, Pls.' Mot. ('286 dkt. #358).)

"subsequently asked" by plaintiffs' law firm to "see if I could [apportion cause] using my epidemiological approach."  (6/2/15 Anderson Depo. ('286 dkt. #239) 337.)

As noted, plaintiffs were required to disclose this additional opinion timely. While it is not clear why plaintiffs could not have requested this analysis as part of Anderson's original report, the court would have entertained a motion to supplement this opinion had plaintiffs sought leave, but they failed to do.  As such, the court agrees with defendant that plaintiffs have failed to demonstrate that the disclosure of a new opinion during Anderson's deposition was either substantially justified or harmless under Federal Rule of Civil Procedure 37(c)(1).  Accordingly, the court will not allow plaintiffs to offer this new theory or opinion at trial and will strike the portion of Anderson's deposition testimony articulating this new opinion.

## UNDISPUTED FACTS[7]

### A.  Overview of Weyerhaeuser Plant and Use of Asbestos

Plaintiff Weyerhaeuser acquired a door plant located in Marshfield, Wisconsin, from Roddis in August 1960 and sold the facility in 2000.  The Marshfield plant manufactured wood products with multiple operations and divisions on site, including a dry kiln, particleboard plant, molded products plant, warehouse, a door factor building (referred to as the door mill), and a mineral core plant.  Weyerhaeuser manufactured a door core containing asbestos in the mineral core plant, which opened in 1968, although

---

[7] The court finds the following facts material and undisputed unless otherwise noted.

Weyerhaeuser had used asbestos to manufacture doors before 1968.[8]   Weyerhaeuser stopped using asbestos in June 1978.

## B.  Facts Specific to Each Worker's Diagnosis and Overall Exposure to Asbestos

### i.  Milton Boyer

Milton Boyer was diagnosed with mesothelioma on March 13, 2014, and passed away on August 31, 2015.  He was employed by Weyerhaeuser at the Marshfield plant from 1973 to 1983.  During that time, his job duties involved work in the core mill area of the door plant, including spending time sweeping the mineral core area, dumping the sweeper and operating a power jimmy operator in the core mill.  Boyer also assisted in cleaning the mineral core forming pans on one occasion, helping to pound the dust out of the pans.  Boyer testified that his "biggest dose" of asbestos came from sweeping the mineral core department.  (Def.'s PFOFs ('286 dkt. #223) ¶ 35 (quoting Boyer 6/16/14 Depo. ('286 dkt. #71) 56).)

Boyer lived outside Marshfield his entire life, except for approximately four years between 1975 to 1979 when he lived at 302 West Blodgett Street and 605 East Vine Street in Marshfield.  (From Google Maps, it appears that the West Blodgett apartment is located about 1.07 miles from the plant and the East Vine residence is approximately 0.6 mile from the plant.)  Boyer testified at his deposition that he noticed his car frequently had dust on it during this period.  He described the dust as similar to what was in the mineral core, although he also stated that it was "probably . . . all concrete

---

[8] Roddis may have also used asbestos, namely Kaylo, in manufacturing fire doors beginning in 1959, although Weyerhaeuser challenges plaintiffs' evidence on this point.

dust" from the concrete plant in Marshfield.  (Def.'s Reply to Def.'s PFOFs ('286 dkt. #383) ¶ 37 (quoting Boyer 6/18/14 Depo. ('286 dkt. #72) 76).)

Both of Boyer's parents worked in the Weyerhaeuser plant as well, and he lived with his parents until 1972.  While there is conflicting evidence in the record, Boyer contends that his father drove a garbage truck for the plant.  Boyer also believed that his father worked in the mineral core area, but did not have personal knowledge of this.  For purposes of summary judgment, the court assumes that Boyer's father drove the garbage or dump truck, which involved contact with the mineral core part of the plant.  Boyer's mother, however, worked solely in door inspection in the veneer department and did not work in the mineral core department.

Boyer reports that his father's clothing was always dusty or dirty after work, and Boyer remembers hugging his father after he returned from work.  Boyer also testified that his father's car was a "dusty mess" and that he never cleaned it.  (Boyer 6/16/14 Depo. ('286 dkt. #71) 20; Boyer 6/18/14 Depo. ('286 dkt. #72) 14-15.)  In addition, Boyer helped his mother with the laundry beginning at age six or seven and until he was 12 or 13, which involved shaking dust and debris off of his father's work clothes.

Finally, in 1966 and 1967, Boyer attended Marshfield Junior High School, which was located less than a mile from the plant.  During that time, he played football after school on a field located directly across the street from Weyerhaeuser.

### ii.    Richard Masephol

Richard Masephol was diagnosed with mesothelioma on January 9, 2014.  He passed away on May 3, 2015.  Masephol was employed by Weyerhaeuser at the

Marshfield facility from 1973 to 2014.  From approximately 1974 to 1979, Masephol worked in the core mill operating saws for tonguing and grooving the mineral cores.  His work required him to touch and move mineral cores.  During that time, Masephol was personally monitored for asbestos exposure.

Masephol lived in Chili or Spencer, Wisconsin his entire life and attended grade school and high school in Granton, Wisconsin.  Chili is approximately 10 miles from Marshfield, and Granton is approximately 20-25 minutes from Marshfield.  Plaintiff represents that he attended a tech school in Marshfield for welding in 1974, but the record fails to disclose the location of that school.  Before 1979, Masephol also testified that other than for work, he was within a mile of the plant approximately one or two times per week (for example, to go to the hardware store or the labor temple).[9]

Masephol also claims he was exposed to asbestos by his father, who worked at the plant between 1948 and 1982.  Masephol lived with his parents until 1984.  Masephol acknowledged that he never knew about his father working in or being assigned to the area around the mineral core plant, but he also testified that his father worked in door inspection and drove a jimmy in the general factory.  For at least one summer, he also worked for buildings and grounds on the roof.  In those jobs -- particularly, in maintenance -- Masephol's father may have been exposed to asbestos.

Masephol testified at his deposition that as he was growing up, his father would throw his work clothes on the floor after returning from work and that he only changed

---

[9] For the reasons explained below, the specific location of the tech school and the frequency of Masephol's visits to Marshfield are ultimately immaterial to his claim.  (*See,* discussion, *infra* Opinion § I.C.iii.)

his work clothes once or twice a week.  Masephol was also in close proximity to his mother when she would do the laundry, including his father's work clothes.  Finally, Masephol testified that he rode with his father to work for a couple of months and that his car was always dusty.

### iii.  Urban Pecher

On November 27, 2013, Urban Pecher was diagnosed post-mortem with peritoneal mesothelioma.  Pecher was employed by Weyerhaeuser at the Marshfield facility from 1953 to 2000.  Pecher's duties included working in the detail department and hauling waste materials to the landfill.  In his role in the detail department, Pecher worked on fire-rated doors, including doors with mineral core, and cut into the fire door cores for windows and other openings.  Like Masephol, Pecher also was part of the asbestos surveillance program.

In 1961, Pecher and his wife moved to the 200 block of South Maple Street in Marshfield, located approximately 0.6 mile from the plant, and lived there for approximately five months.  In 1969, Pecher moved to 402 North Peach Avenue, which is located approximately 0.51 mile from the plant, and lived at that residence for at least ten more years.  While living at both of these residences, Pecher would walk or ride his bike to work.

In addition, Urban Pecher's wife, Janet, testified that the laundry hung outside, the windshield of their vehicle and their window sills were at times covered with off-white dust that she believed was from the Marshfield plant, in part because it was the same color as the dust that came home on her husband's clothing after work, though she

admitted that she did not know the make-up or content of the dust she saw around her home.

### iv.   Valmore Prust

Valmore Prust was diagnosed with an asbestos-related lung disease in February 2009 and ultimately was diagnosed with lung cancer on January 7, 2010.  Prust passed away on May 17, 2011.  He was employed by Weyerhaeuser at the Marshfield plant from 1958 to 1979, and was exposed to asbestos through his employment.  Prust also smoked one pack of cigarettes per day for more than 45 years, quitting in 2000.

From approximately 1955 until 1960, Prust lived at 811 East Fifth Street, located approximately 0.18 mile from the Weyerhaeuser plant.  In 1963, the Prusts moved to 1518 South Locust Avenue, which plaintiffs represent is approximately 1.2 miles from the Weyerhaeuser plant, although Google Maps suggests it would be more like 1.4 miles. Prust also claims exposure through his wife's work at Weyerhaeuser, though plaintiff acknowledges that Virginia Prust worked exclusively in the veneer department, where asbestos was not used.  Still, plaintiffs contend that elevators were used to move dusty loads of veneer and other materials between the veneer department and other floors, including the mineral core area.

Prust also was a member of Immanuel Lutheran Church, located less than one mile from the Weyerhaeuser plant.  Prust also claims exposure from his frequent visits to Miller's QuickLunch, located approximately 0.13 miles from the Weyerhaeuser plant at 208 S. Palmetto, and Pete's Bar located at 400 N. Central Ave., approximately 0.82 miles from the plant.

18

### v.    Roger Seehafer

Roger Seehafer was diagnosed with mesothelioma on November 8, 2013, and died February 23, 2015.  Seehafer was employed by Weyerhaeuser at the Marshfield plant from 1955 to 1999.  During his employment, Seehafer worked in door inspection, which typically involved his inspecting 100 to 200 doors each day.  Some of those doors contained mineral core.  At some point, Seehafer also worked in the detail department, which involved cutting and drilling holes into doors with a mineral core, as well as in the "mortising" department, which also involved cutting into door cores.

Seehafer lived outside of Marshfield in the towns of Spencer and McMillian until 1998, except for a few months in 1966 when he lived at his brother's house at an unknown address in Marshfield.  Seehafer also claims exposure to asbestos from 1955 to 1967 while delivering milk to a creamery across the street from the Marshfield facility.  Finally, Seehafer claims exposure in 1965, from stopping by his ex-wife's house, located on Arnold Street (less than a mile from the plant), for ten to fifteen minutes at a time to pick up his children about once a week.

### vi.    Wesley Sydow[10]

Wesley Sydow was diagnosed with mesothelioma on February 24, 2014, and passed away on March 29, 2015.  He was employed by Weyerhaeuser at the Marshfield

---

[10] The court previously granted plaintiff Sydow's motion to file an amended complaint, naming his wife Theresa Sydow as the plaintiff individually and as the special administrator of Wesley Sydow's estate.  Sadly, as explained in plaintiff's second motion for leave to file a third amended complaint, Theresa Sydow has now passed away too.  (Pl.'s 2d Mot. to File 3d Am. Compl. ('419 dkt. #440).)  In that motion, plaintiff sought leave to file an amended complaint once the new special administrator was named, asking for an extension until January 25, 2016.  (*Id.* at 2.)  The court will grant plaintiff's motion, and require plaintiff to file a third amended complaint naming the new special administrator as plaintiff on or before March 3, 2016.

plant from 1947 to 1990, holding several assignments including chief inspector, quality control manager, general fabrication supervisor, fabrication superintendent, and claims manager.   Sydow testified that he was in the mineral core area at least on a daily basis.

From age eight to the present, Sydow has lived at various locations around Marshfield, including from 1957 to 1967, a house located at 800 South Palmetto Avenue, approximately 0.5 mile from the plant, and from 1967 to at least the time of his deposition, at 1800 South Cedar Street, approximately 1.1 mile from the plant.   Despite their proximity to the plant, none of Sydow's houses were tested for asbestos.   When living at the South Cedar Street house, Sydow would walk to and from the Weyerhaeuser plant for work, and he would occasionally come home for lunch as well.

At his deposition, Sydow testified that from his house on South Palmetto, he would see a billow of dust every once in a while.   This came from what he thought was the core mill baghouse, but he was not certain of its source because he could not see the baghouse from his home.   Sydow also testified at his deposition that he did not believe he was exposed to asbestos from living in the town of Marshfield.   (Def.'s PFOFs ('286 dkt. #223) ¶ 100 (quoting Sydow Depo. ('219 dkt. #168) 112-13).)

Sydow's son worked in the core mill while he was still living at home, though defendant points out that his son worked the third shift, so he was at work while Sydow was home asleep and Sydow had already gone to work by the time Robert came home from work.

20

### vii.   Sharon Heckel

Sharon Heckel was diagnosed with lung cancer on January 23, 2012.  She passed away on August 17, 2012.  Heckel smoked one pack of cigarettes per day from the age of 20 to the age of 54.  She was also employed at the Weyerhaeuser plant from 1970 to 2009, and worked in the mineral core area for approximately 4 years before 1978.  In her work in the mineral core area, Heckel was exposed to dust from cutting and sanding asbestos door cores and these exposures occurred on a daily basis.

Heckel lived at various locations in Marshfield from approximately 1966 to 1978. From 1966 to sometime in 1968 or 1969, the Heckels lived at a house on Doege Street, roughly six blocks and likely less than a mile from the Weyerhaeuser plant, although plaintiff does not provide an exact address or distance.  Around 1970, the Heckel family lived briefly at a house on Hinman Avenue, approximately five blocks north of the plant. (The court will assume for purposes of summary judgment that this house was also within 1.25 miles of the plant.)  From approximately 1970 to 1978, Heckel lived on 29th Street, approximately one mile from the plant and approximately 0.25 mile from the landfill near the airport.

While Heckel claimed non-occupational exposure due to Weyerhaeuser trucks driving by her homes on the way to the landfill, there appears to be no dispute that the Weyerhaeuser trucks either did not drive by her home or were not using a specific landfill during the time she lived close to that landfill.  Heckel's husband worked in the boiler room at Weyerhaeuser in the mid-1960s, although plaintiff offers no evidence of his

exposure to asbestos, and in turn, to any household exposure on the part of Mrs. Heckel because of her husband's employment.

### viii.   Rita Treutel

Rita Treutel was diagnosed with mesothelioma on March 30, 2012.  Treutel was employed by Weyerhaeuser at the Marshfield facility from 1966 to 1984, where she worked as a panel line offbearer from 1966 to 1968 and as a mill clerk from 1969 to 1984.  During her employment, Treutel spent time on the manufacturing floor of the detail department where fire door cores were cut.

Treutel did not live in Marshfield until 2000, when the Treutels sold their home since 1966 and moved into an apartment in Marshfield.[11]  Still, her daughter testified that Treutel would "sometimes" visit Marshfield either to go grocery shopping, clothes shopping, or visit the zoo or park.

Treutel's husband worked at the plant from 1946 to 1983, but worked in the veneer department for all times material to Treutel's claims.  Asbestos was not used in the veneer department.  Treutel's daughter spent two summers working at the facility in 1966 and 1967.  During her second summer, she started work on the electronics machine, which involved handling pieces of mineral core, including shoveling Kaylo dust at the end of the shift.  Treutel's son also worked at the plant during the summer of 1968 as a hot press helper, but denied knowing whether he worked on fire doors in that job.

---

[11] Treutel's son testified at his deposition that the family car was always dusty, but he did not know where the dust came from.  Treutel's daughter, however, testified that she never thought about or noticed that Marshfield was a dirty or dusty place.

Finally, Treutel did all of the laundry for her family during this period and her children reported that their clothes were dusty and dirty from working at the plant.

## C. Evidence of Asbestos Emissions in Households and in the Community

### i.   Evidence of Asbestos Emissions from the Plant

The door cores contained 5.6% of Chrysotile asbestos and 11.2% of Amosite asbestos.  Relying on a proposal for a production facility, plaintiffs maintain that to produce 70,000 fire doors per year, Weyerhaeuser used 117 tons per year of Chrysotile and 235 tons per year of Amosite.  (Pl.'s PFOFs ('286 dkt. #362) ¶ 9.)

Plaintiffs cite to deposition testimony of former Weyerhaeuser employees, including those suing here, about baghouses regularly becoming plugged with excess mineral core dust, resulting in dust shooting up like a geyser out of the plant into the environment.  Employee Charles Reno also testified that his work in the maintenance department required him to resolve issues with the baghouses on at least a weekly basis. In particular, when baghouses became clogged or malfunctioned, Reno testified that he would "take an air hose in there and -- with a long wand and blow them out" at the direction of Weyerhaeuser management.  (Pls.' PFOFs ('286 dkt. #362) ¶ 13 (quoting Reno Depo. ('286 dkt. #227) 18-19); *see also* Pls.' PFOFs ('286 dkt. #362) ¶ 18.)

Defendant points out that there were multiple baghouses on site, including ones that were not specific to asbestos, but in addition, plaintiffs point to Weyerhaeuser employees' testimony that during the weekend, windows in the mineral core area would be opened with fans pointing to blow (presumably fouled) air out of the windows into the community.

Plaintiffs also submit evidence of internal and community complaints about emissions from the plan.  In a letter to Jerry Saindon dated January 20, 1977, an employee only identified by "Mark" describes "a serious problem as it relates to expos[ure] to mineral core dust outside the areas designated for monitoring and control, and specifically expressed concern about the baghouse system suffering from frequent leaks and plug-ups.  (Pls.' PFOFs ('286 dkt. #362) ¶ 16 (quoting Herrick Decl., Ex. 12 ('286 dkt. #355-28)).)   Weyerhaeuser employee Verna Fohrman testified that cars parked in the employee parking lot would be covered in dust.  Fohrman also testified that at times a bridge on the plant property looked like it had been hit by a "snowstorm, for all the Kaylo dust."  (Pls.' PFOFs ('286 dkt. #362) ¶ 38 (quoting Fohrman Depo. ('286 dkt. #337) 12).)

In addition to asbestos emissions from the plant itself, Weyerhaeuser employees hauled asbestos dust and scrap waste to landfills.  Approximately three loads of mineral core waste, filling a 5-ton truck were taken to one of the landfills each day.    One document reports that in October 1974, Weyerhaeuser disposed of 193 truckloads of solid waste each week, but does not specify whether the waste was asbestos or solely from the mineral core area.  For some portion of the relevant period, these waste trucks were not even covered, and one driver reported seeing dust behind the trucks if the wind was blowing.  Weyerhaeuser employees also testified that the process of dumping the dust in the landfills would result in "white cloud coming down the[] fields" of nearby farms. (Pls.' PFOFs ('286 dkt. #362) ¶ 36 (Genett Depo. ('286 dkt. #232) 25).)

In addition, unloading the waste, employees would sweep the trailers, resulting in further release of asbestos fibers into the air.  For some portion of the relevant period, the waste trucks were loaded by backing up to a dock, which was open to the outside, resulting in further dispersal of asbestos dust, although defendant points to other employees' testimony that, at some point, mineral core waste and dust was sprayed with water before loading it into trucks for disposal.

###         ii.    Anecdotal Evidence of Dust in Households and the Community More Generally

Plaintiffs contend that mineral core dust was "off-white" and had a "distinctive appearance."  (Pls.' PFOFs ('286 dkt. #362) (quoting Koepke Depo. ('286 dkt. #353) 54-55).)  Members of the community, including plaintiffs, testified that their laundry would be lighter in color or covered in dust after having been hung outdoors and that dust would settle on windows and window sills of homes located near the plant.  (Pls.' PFOFs ('286 dkt. #362) ¶¶ 40-45.)  Members of the community also wrote letters to the local newspaper complaining about dust settling on clean laundry.  Finally, plaintiffs maintain that Weyerhaeuser, including the corporate office in Washington, were aware of complaints made by community members.

In contrast, defendant points to other portions of the same witnesses' deposition testimony in which they testified that:  (1) sometimes the dust was black or some other color; (2) the dust was present either before or after the period that Weyerhaeuser used asbestos; and (3) they were not certain of the source of the dust.  (*See* Def.'s PFOFs ('286 dkt. #223) ¶¶ 19-24, 37, 59, 70, 73, 99, 112, 114-22.)  In addition to calling into question the veracity of the individual accounts of "dust" in and around homes close to

the plant, Weyerhaeuser points out that almost every department in the facility had machinery that generated waste or dust. In particular, the plant produced a large quantity of wood dust. Dust could also come from (1) boilers that burned other materials, including coal, (2) stacks from the particleboard plant, and (3) baghouses that collected dust from a variety of departments. Dust could further come from the fuel boiler, the particle board plant, the Heil dryer and other dryers. Even beyond the Weyerhaeuser plant, there were dirt and gravel roads in Marshfield. A cement plant was also considered a source of dust. Plaintiffs do not dispute this, but contend that at least one source of the dust emitted from the Weyerhaeuser plant was mineral core or Kaylo dust.

While none of the plaintiffs' residences have ever been tested for asbestos, some of the plaintiffs or other family members testified to "dust" on cars, and in and around their respective homes, as detailed above. Moreover, one theory of household exposure involves asbestos fibers brought home on the work clothes of plaintiffs' parents or other family members.[12]

### iii.   Emissions and Air and Soil Testing

In December 1973, Weyerhaeuser conducted an analysis of the particulate material collected during emissions tests for the presence of asbestos. No asbestos fibers were detected. In 1974, Weyerhaeuser's industrial hygienist Joseph Wendlick also

---

[12] Plaintiffs are bound by the court's ruling that Wisconsin's Workers' Compensation Act would preclude recovery for any injuries the workers named in this suit caused by asbestos fibers brought home by those workers themselves. (*See* 8/22/14 Op. & Order ('286 dkt. #94).)

conducted air sampling tests for asbestos at five locations within a few blocks from the plant.  The results reflected levels between 0.003 to 0.005 fibers per cubic centimeter.

In their response to defendant's proposed findings of facts, plaintiffs contend that the tests cannot be "accepted as professionally valid" in light of the fact that there is no documentation of the testing and Wendlick was unable to describe the conditions of the sampling at his March 2014 deposition.  (Pls.' Resp. to Def.'s PFOFs ('286 dkt. #361) ¶ 124.)   Curiously, however, at the *Daubert* hearing, plaintiffs' expert Frank Parker purported to rely on Wendlick's testing to support his conclusion that there were significant asbestos emissions from the plant.  (12/3/15 Hearing Tr. ('286 dkt. #455) 154.)   In addition, plaintiffs themselves submitted Wendlick's more favorable (for plaintiffs) test results from areas close to the dumpsites.  (Parker Rept. ('286 dkt. #263); *id.*, Ex. 1 (dkt. #263-1); 12/3/15 Hearing Tr. ('286 dkt. #455) 154, 185, 199; Pls.' PFOFs ('286 dkt. #362) ¶ 30 (citing Herrick Decl., Ex. 4 ('286 dkt. #360-4) (reporting concentrations ranged from 0.019 to 0.227 f/cc one-quarter from the dumpsite, to 0.122 to 0.445 f/cc 100 feet from the dumpsite)).)

### D. Connection between Asbestos Exposure and Mesothelioma and Lung Cancer

The association between the development of mesothelioma and the inhalation of asbestos fibers is so strong that mesothelioma is known as a "signature disease" -- one for which a single causative agent, asbestos, has been identified, and without exposure to which, the disease does not typically occur.  Regardless, there is *no* dispute in this case that plaintiffs Boyer, Masephol, Pecher, Seehafer, Sydow and Treutel developed

27

mesothelioma as a result of asbestos exposure.  Instead, the core dispute is whether any *non*-occupational exposure was a substantial contributing factor to plaintiffs' contracting the disease.

Plaintiffs contend that medical literature demonstrates that there is no level of exposure to asbestos below which clinical effects do not occur.  Weyerhaeuser contends that this statement is misleading at best, particularly in light of at least one of the publications cited by plaintiffs that provides a "permissible exposure limit."  (Def.'s Resp. to Pls.' PFOFs ('286 dkt. #384) ¶ 3.)  Plaintiffs also represent that medical literature contains "case reports of mesothelioma caused by as little as a few months, weeks or even days of asbestos exposure" (Pls.' PFOFs ('286 dkt. #362) ¶ 4), though Weyerhaeuser points out that the same reports "show that mesothelioma is typically detected after many years of occupational exposure" (Def.'s Resp. to Pls.' PFOFs ('286 dkt. #384) ¶ 4). Finally, the Helsinki Criteria for Diagnosis and Attribution provides criteria diagnosis and attribution to asbestos, and states that for mesothelioma, "'a history of *significant* occupational, domestic or environmental exposures to asbestos' would suffice for attribution."  (Def.'s Resp. to Pls.' PFOFs ('286 dkt. #384) ¶ 5 (citing Herrick Decl., Ex. 20 ('286 dkt. #36-22) 311-12 (emphasis added)).)[13]

As for lung cancer caused by asbestos exposure, the relative risk is estimated to increase from 0.5 to 4% for each fiber per cubic centimeter per year (fiber-years) of

---

[13] Plaintiffs cite to the 1997 Helsinki Criteria, but, as defendant points out, the document was updated in 2014.  Nonetheless, the 2014 document contains the same requirement that there must be a history of "significant" exposure to attribute mesothelioma to asbestos.  (*See* Ellis Decl., Ex. P (dkt. #389-2).)

cumulative exposure.  As a result, one year of "heavy" exposure or five to ten years of "moderate" exposure may increase the risk of developing lung cancer two-fold or more. (Pls.' PFOFs ('143 dkt. #302) ¶ 2.)[14]

Still, as defendant points out the dose of asbestos required to produce lung cancer is "much higher" than that required for mesothelioma.  (Def.'s Resp. to Pls.' PFOFs ('143 dkt. #320) ¶ 2 (quoting 6/1/15 Anderson Depo. ('143 dkt. #212) 101-02); *see also* Parker's Prust Rept. ('143 dkt. #209) p.3 ("It also appears that the dose of asbestos [concentration X time] required to produce lung cancer is much higher than that required for mesothelioma." (bracket in original)).)  Here, defendant concedes that plaintiffs Prust and Heckel developed lung cancer at least in part as a result of asbestos exposure, but as with plaintiffs' contracting mesothelioma, disputes that any *non*-occupational exposure was a substantial contributing factor.

OPINION

## I.  *Daubert* Motion

Relying on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), defendant Weyerhaeuser Company moved to strike the trial testimony of three of plaintiffs' experts -- Frank Parker, Dr. Henry Anderson, and Dr. Jerrold Abraham.  Consistent with Wisconsin Worker's Compensation Act's exclusivity provision, the court previously limited plaintiffs' public

---

[14] The 1997 Helsinki criteria defines "heavy exposure" to include "manufacture of asbestos products, asbestos spraying, insulation work with asbestos materials, [and] demolition of old buildings."  (Herrick Decl., Ex. 20 ('143 dkt. #300-22) 4.)  "Moderate exposure" includes "construction and shipbuilding."  (*Id.*)

29

and private nuisance claims against Weyerhaeuser to those based on injuries caused by community and household exposure, and then only that household exposure *not* caused by plaintiffs bringing home asbestos fibers on their own work clothing.  (*See* 8/22/14 Op. & Order ('286 dkt. #94).)[15]   In its Daubert motion, Weyerhaeuser takes issue with plaintiffs' expert's proposed opinion testimony that community and household exposures "contributed to [p]laintiffs' injuries."  (Def.'s Br. ('286 dkt. #299) 2.)

Among other arguments, defendant contends that plaintiffs' experts have not and "cannot untangle Plaintiffs' occupational exposures from any non-occupational exposures."  (*Id.* at 3.)  Most notably, as defendant points out and plaintiffs' experts acknowledge, "[t]here is no evidence in the record of any Marshfield community member having any asbestos-related condition other than former plant employees."  (*Id.*)  In addition to that core concern, Weyerhaeuser takes issue with the lack of data and facts demonstrating that substantial amounts of asbestos were introduced into the community and plaintiffs' households.

On December 3, 2015, the court held a hearing on defendant's *Daubert* motion, during which defendant's and plaintiffs' counsel presented argument and the court heard testimony from Frank and Anderson.  (12/3/15 Hearing Tr. ('286 dkt. #455).)

---

[15]  In other words, plaintiffs' household exposure is limited to instances where other family members brought asbestos fibers home from their respective employment with Weyerhaeuser.

### A. Summary of Three Experts' Testimony

### i. Frank Parker

Parker is a certified industrial hygienist, certified safety professional, engineer, diplomate environmental engineer, and licensed individual asbestos consultant.   Parker analyzed documents provided by plaintiffs' counsel concerning the fire door manufacturing operations at Weyerhaeuser, purportedly using a "Systems Approach," which provides a picture of plant operations related to emission of asbestos and exposure to workers, the community and household members."  (Parker Rept. ('286 dkt. #263) 7.)  In his general report, Parker listed fourteen opinions.  (*Id.* at 39-41.)  In addition to drafting one overarching / general report, Parker also submitted a report for each of the plaintiffs detailing his or her individual asbestos exposure, including occupational, community and household sources.  (*See, e.g.,* Parker's Boyer Rept. ('286 dkt. #451-10).)

Pertinent to this motion, Parker reviewed records describing visible emissions into the community and concluded that "[i]f we take a very conservative fugitive emission rate of 1% and based on Rennord's [a Weyerhaeuser's engineer from 1967] estimates, then Weyerhaeuser most likely emitted into the local community some 1.2 tons/year of chrysotile and 2.35 tons/year of Amosite asbestos."  (Parker Rept. ('286 dkt. #263) 17.)  Parker details various avenues for community exposure, including disposal of waste, transportation of contaminated materials, filter inefficiencies, etc.  (*Id.* at 16-19.)  As for household exposure, Parker opines that fibers were carried out of the plant and into the house itself, in air, in contaminated vehicles or on clothing.

Parker also reviews studies of bystanders (employees of companies that used asbestos, but who were not specifically exposed to asbestos in their work), community and household exposure from other locations, including instances, for example, of housewives developing asbestos-related diseases from handling clothing and other items that had asbestos fibers on it.  (*Id.* at 26-37.)  Parker does not cite to any studies specific to Marshfield.

Ultimately, Parker offers the following key opinions in his reports:

- Plaintiffs were "significantly occupationally exposed to asbestos":  "Persons handling and/or disturbing raw asbestos and/or the fire door cores were significantly occupationally exposed to asbestos fibers;" and "People who were simply on the plan site were most likely exposed to asbestos in significant concentrations."  (*Id.* at 39-40.)[16]

- Community exposure was "in excess of typical ambient [background] concentrations."  (*Id.* at 40.)

- "Household members who lived and/or visited houses where workers or other contaminated persons or things entered the house were exposed to airborne asbestos concentration in excess of typical ambient [background] concentrations."  (*Id.* at 40.)

- Each specific plaintiff received "significant asbestos exposures" based on either (1) living at a house located close to the plant; (2) attending school at a school located close to the plant; (3) visiting Marshfield; and/or (4) living with a family member who worked at the plant.  (*See, e.g.*, Parker's Boyer Rept. ('286 dkt. #451-10) 5-6.)

---

[16] Parker also opines that contaminated workers were allowed to leave the plant with asbestos on their clothes and in their car (Parker Rept. ('286 dkt. #263) 40), but any claim based on this type of exposure is also barred by the exclusivity provision of the Wisconsin Worker's Compensation Act.  (*See* 8/22/14 Op. & Order ('286 dkt. #94).)

ii.    **Henry A. Anderson, M.D.**

Henry A. Anderson, M.D., is a board certified physician in occupation and environmental medicine and currently Chief Medical Officer for Occupation and Environmental Health and State Occupation and Environmental Epidemiologist with the Wisconsin Division of Public Health.   Dr. Anderson also prepared on overarching/ general report and a shorter report for each of the eight plaintiffs.

In the general report, Anderson provided an overview of Roddis/Weyerhaeuser Marshfield door plant, including his personal experience with the plant in the 1970s and 1980s concerning vinyl chloride, though not asbestos.   Anderson also summarized Parker's report concerning asbestos releases into the community.

Pertinent to this *Daubert* challenge, Anderson describes how diseases develop from asbestos exposure:

> Asbestos related diseases are the product of multiple exposures to asbestos fibers inhaled through the lungs.   A small percentage of these fibers are retained in the lungs causing an insult to the tissue.   All exposures to asbestos fibers are considered to contribute to the disease process. This opinion is supported by the human epidemiologic studies that demonstrate a dose-response relationship between asbestos exposure and the risk of disease. In other words, the more fibers a person inhales[,] the higher the risk of developing clinical disease.

(Anderson Rept. ('286 dkt. #262) 6.)   Anderson also reviewed studies describing four types of asbestos exposure: (1) occupational; (2) bystander; (3) household and (4) community.   (*Id.* at 8-9.)   Anderson then reviewed studies linking asbestos to cancer, including mesothelioma.

Specific to household and community exposure, Anderson cited studies describing instances of asbestos-related diseases solely based on household exposure.  (*Id.* at 12-14.)  Although none of these studies were specific to Marshfield, Anderson still relied on these studies in opining that:

> The cluster of six mesothelioma cases reported to be diagnosed between 2012 to 2014 in Marshfield is consistent with the published literature and other data about the impact on surrounding neighborhoods from a single major source point for asbestos fiber emissions.  This data can be relied upon as scientific evidence supporting causation from Roddis/Weyerhaeuser Marshfield door plant emissions as the source for each of the individual victims.

(*Id.* at 15.)  Notably, Anderson did not attempt to distinguish the occupational exposure from the household or community exposure.

Finally, Anderson offers the following key opinions in his report:

- "The cumulative exposure to asbestos adds to the risk of developing asbestos disease and is the cause of asbestos related disease."  (*Id.* at 20.)

- "Within a radius of 1.25 miles or greater, emissions of asbestos from the Marshfield door plant operations increased the risk of developing asbestos related diseases."  (*Id.* at 21.)

- Plaintiffs' "occupational, household and community exposure . . . each substantially contributed to his cumulative lifetime asbestos exposure which caused" mesothelioma or lung cancer.  (Anderson's Boyer Rept. ('286 dkt. #451-1) 4.)

### iii.    Jerrold L. Abraham, M.D.

Jerrold L. Abraham, M.D., is a Professor of Pathology and Director of Environmental and Occupational Pathology at University Pathologists Laboratories, LLP.  Dr. Abraham reviewed each plaintiff's medical record and provided a very brief, one-page report, confirming each plaintiff's diagnosis of mesothelioma or other asbestos-related

34

cancer.  Abraham relied on Parker's report to state that each plaintiff "has exposure occupationally, in the community and also in the household."  (Abraham's Boyer Rept. ('286 dkt. #265) 1.)

### B.  Overview of Legal Standard

The admissibility of expert testimony in federal courts is governed principally by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court functions as a "gatekeeper" regarding expert testimony.  The court must determine whether a party's proffered expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable").  Although expert testimony is "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), it must satisfy the following three-part test:

(1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;

(2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and

(3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## C.  Core Challenges to Reliability

For the purposes of deciding the present *Daubert* motions, as well as defendant's motions for summary judgment, the court credits Drs. Anderson's and Dr. Abraham's respective testimony that plaintiffs' mesothelioma and lung cancer were caused by asbestos exposure from Weyerhaeuser's use of asbestos in the production of fireproof door cores.  As clarified during the *Daubert* hearing, defendant's first challenges whether Parker, in particular, can reliably testify to significant asbestos emissions into the community from the plant.  The court takes up this challenge first before turning to the main challenge to plaintiffs' expert's causation testimony -- whether plaintiffs' experts can reliably testify that plaintiffs' *non*-occupational exposure was a substantial contributing factor to each plaintiff's asbestos-related injuries.

### i.   Reliability of Opinions on Asbestos Emissions and Community Exposures

Defendant takes issue with the lack of facts or data supporting Parker's opinion testimony that emissions from the Weyerhaeuser plant created "significant" community and household exposures.  (Def.'s Br. ('286 dkt. #300) 16.)  In particular, Weyerhaeuser points out that despite Parker's testimony that present-day attic sampling is useful in cases such as these, the attic and soil testing he completed in these cases were all negative for any detectable asbestos in any of the samples.[17]  Weyerhaeuser points out further that these studies were not disclosed by plaintiffs until Weyerhaeuser noted time on Parker's invoice for conducting those studies.  At the hearing, Parker testified that he did not disclose these test results because they were conducted by someone else in his office, although he acknowledged having "the impression [the tests] were negative."  (12/3/15 Hearing Tr. ('286 dkt. #455) 150.)

Certainly, Parker's failure to conduct more testing, particularly when coupled with his failure to disclose the results of testing that undermine his opinions in this case, impacts his credibility.  Still, Parker offered other evidence bolstering his opinion, meaning that a jury may still determine if Parker's opinions are well founded overall, rather than this court striking his testimony altogether based on this single contradiction.

Weyerhaeuser also argues that Parker's reliance on reports of "dust" in the community without speaking with individuals or otherwise ascertaining the nature of the

---

[17] As Parker explained in his report, "[a] very important characteristic of an asbestos fiber is that it does not naturally decompose into something that no longer is asbestos.  Every asbestos fibril released in a workplace is somewhere today; it does not magically transform itself or vanish." (Parker Rept. ('286 dkt. #263) 22.)

dust renders his testimony unreliable.  (Def.'s Br. ('286 dkt. #300) 20-21.)  Specifically, Weyerhaeuser points to evidence that:  (1) none of the individuals who described the dust knew its content; and (2) the descriptions of dust occurred before and after the period in which asbestos was used at the plant.  (*See supra* Undisputed Facts § C.ii.)  *See also Korte v. Exxonmobil Coal USA, Inc.*, 164 F. App'x 553, 557 (7th Cir. 2006) (unpublished) (affirming district court's order striking expert testimony where expert "did not rely on tests conducted on the [coal] dust found in or around the Kortes' property[,] . . . did not know the chemical composition of the dust on the Kortes' property, and could not verify that the dust emanated from Exxon's RDAs. Dr. Orris also did not conduct or rely on tests measuring the amount of exposure in order to opine whether the dose to which the plaintiff was exposed is sufficient to cause the disease.") (internal citation and quotation marks omitted).

In response, plaintiffs point out that Parker reasonably relied on: (1) Weyerhaeuser's own asbestos measurements in the Marshfield community in the 1970s; (2) anecdotal evidence of off-white dust emanating from the mineral core plant where asbestos doors were being made and then leaving the plant; (3) evidence of the quantity of asbestos products being processed in the plant, coupled with evidence of issues with the plant's ventilation system and handling of waste materials; and (4) his own expertise as to asbestos drift and dust dispersion.  While none of this is *overwhelming*, or even necessarily persuasive to this court, it is evidence and science based, which is appropriately considered by the trier of fact.  (Pls.' Opp'n ('286 dkt. #359) 33-35; 12/3/15 Hearing Tr. ('286 dkt. #455) 143 (listing evidence), 172 (company records of

asbestos production and management; "All that data shows you that this plant . . . is producing high concentrations of asbestos and it's not well controlled."), 184-85 (describing Wendlick's testing for Weyerhaeuser).)

Defendant is, of course, correct to point out anecdotal evidence of black or other colored dust *not* matching the asbestos-dust description, as well as evidence of dust that occurred before or after asbestos was used at the plant, but the fact that other dust was produced and dispersed from the plant or existed in the community does not foreclose asbestos dust also being present in significant amounts, especially given (1) Weyerhaeuser's own testing, (2) the amounts of asbestos used in the manufacture of doors during the relevant period, and (3) the amount of waste coming from the mineral core bag house and surrounding areas.  As Parker himself conceded at the hearing, there are many sources of dust, but one might still reasonably conclude, as he did, that at least some significant portion of the dust came from asbestos manufacturing.  (12/3/15 Hearing Tr. ('286 dkt. #455) 163-65; *see also* Pls.' Opp'n ('286 dkt. #359) 35.)

### ii.   Reliability of Opinions on Significant Community or Household Exposure

Even assuming some general community and household exposures to asbestos, defendant takes issue with the absence of any *quantification* by Parker of the level or concentration of asbestos in the community -- and in particular plaintiffs' homes -- concluding instead that the exposures were "above background" levels.  While the court credits defendant's argument to a point -- as discussed below, plaintiffs will have to demonstrate *significant* exposure in order to demonstrate that non-occupational exposure to asbestos was a substantial contributing factor -- it is not necessary for plaintiffs'

experts to assign a specific quantity of exposure to opine about its' significance.  With respect to his testimony that the community and household exposures would have exceeded "background levels," Parker opined at his deposition that "if you can see the asbestos dust with human vision, then you have a real concern about reaching the OEL [occupational exposure limit]."  (Pls.' Opp'n ('286 dkt. #359) 41.)

Moreover, Parker did estimate the amount of asbestos emissions as approximately 3 tons of asbestos per year based on some records of asbestos production and his assumption of a fugitive emission rate of 1%, which had at least some basis in the science and his own experience.  While defendant also challenges Parker's methodology, any criticism about this 1% estimate again goes more to the weight than admissibility.  *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 767 (7th Cir. 2013) (reversing district court's order striking testimony, concluding that "[t]he judge should have let the jury determine how the uncertainty about the effectiveness rate affected the weight of Graham's testimony").  At the hearing, Parker also credibly testified that the 1% emission rate for industrial processes is a "fairly low number" based on his "years of experience [looking] at studies about efficiency in process plants."  (12/3/15 Hearing Tr. ('286 dkt. #455) 145.) The court is satisfied that Parker's analysis is based on sufficient, reliable evidence and science for a reasonable jury to conclude that asbestos dispersion into the Marshfield Community was occurring during the period the Weyerhaeuser was using it to manufacture doors.

Of course, defendant also has fodder for effective cross-examination on this subject, but none of its challenges render Parker's opinion testimony as to asbestos

emissions and related community and household exposure without a sufficient evidentiary or scientific basis to be excluded altogether. Accordingly, the court will not strike Parker's opinion testimony on this subject.

### iii. Reliability of Opinion That Non-Employment Exposure Was a Substantial Contributing Factor to Worker's Asbestos-Related Diseases

During their depositions, plaintiffs' experts acknowledged that plaintiffs' occupational exposures were the heaviest, so much so that those exposures could have been the *sole* cause of plaintiffs' respective injuries. (Def.'s Br. ('286 dkt. #300) 15.) Based on this, it is tempting to chalk up plaintiffs' asbestos-related injuries to occupational exposure, and indeed, this may well be the outcome of any trial. To prove the causation element in plaintiffs' nuisance claims, however, the law is settled that plaintiffs need not demonstrate *non*-occupational exposures were the sole cause, the main cause, or even the most likely cause of their disease. Rather, plaintiffs must demonstrate only that the non-occupational exposures were "a substantial factor" in producing their respective asbestos-related injuries. *See Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2001 WI App 148, ¶ 59, 246 Wis. 2d 933, 632 N.W.2d 59.

In briefing, both sides spend a significant amount of time describing the "every fiber" theory and addressing whether expert testimony on that theory is sufficient to permit a reasonable jury to find causation. As became clear at the hearing, however,

41

plaintiffs' experts are *not* adopting an "every fiber" theory.[18]  Instead, plaintiffs' experts propose to testify that:

> (1) there is a dose-response relationship between exposure to asbestos and disease--meaning that the greater an individual's cumulative exposure to asbestos, the greater the risk of developing an asbestos-related disease; (2) low dose exposure to asbestos can cause asbestos-related diseases, specifically mesothelioma; (3) Plaintiffs' asbestos-related diseases were caused by their cumulative exposure to asbestos; and (4) Plaintiffs' community and household exposures to asbestos from the Weyerhaeuser plant's operations in Marshfield were substantial factors in causing their injuries.

(Pls.' Opp'n ('286 dkt. #359) 43-44.)   Not surprisingly, defendant's *Daubert* motion focuses on the fourth element -- whether plaintiffs' experts can reliably opine that the community and household exposures were a substantial factor in causing plaintiffs' respective injuries?

The Seventh Circuit's opinion in *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir. 1992), provides the best guidance on the causation requirement in asbestos cases, albeit applying Illinois law, especially where there are multiple sources of asbestos exposure.  In the *Tragarz* case, multiple manufacturers were involved, while here the comparison is between occupational versus non-occupational asbestos exposures, all of which were the result of Weyerhaeuser's manufacturing operations.  In that case, the court considered: (1) whether there was sufficient evidence to support the jury's finding of causation; and (2) whether the district court had erred in not allowing evidence of exposure to other

---

[18] As the court explained at the hearing and for reasons set forth in this opinion, an "every fiber" theory likely proves too little to find causation, but since this is not plaintiffs' position, the court need not consider whether such testimony would be sufficiently reliable for jury consideration.

manufacturer's products on the issue of causation.   As for the first issue, the court described what is necessary to demonstrate that "the exposure to the defendant's asbestos products was a substantial factor in causing the injured party's disease," which in turn requires consideration of "the frequency, regularity, and proximity of exposure in determining whether the injured party's exposure to defendants' asbestos products was a substantial factor in causing the alleged injury."  980 F.2d at 420.

As for the second issue, the Seventh Circuit concluded that evidence of exposure to other manufacturer's asbestos was not relevant to the issue of causation, rejecting defendant's argument (or at least the implication of its argument) that "the so-called substantial factor test is a comparative test in which the jury assess all contributing causes and determined which ones are substantial."  *Id.* at 424.  Instead, "courts in applying the substantial factor test do not seem concerned with which of the many contributing causes are *most* substantial.  Rather, they seem concerned with whether each contributing cause, standing alone, is a substantial factor in causing the alleged injury." *Id.*

The court went on to explain the policy behind this.

> [S]uppose a plaintiff shows that the amount of exposure that it received from defendant A's asbestos product was *alone* sufficient to cause mesothelioma. If such a plaintiff was not exposed to any other products, the plaintiff would have sufficient evidence to support a finding that but for exposure to the defendant A's product the plaintiff would not have gotten ill. On the other hand, under [defendants'] theory, if the plaintiff was exposed to numerous other asbestos products, the plaintiff might not be able to prove cause in fact in a suit against defendant A because the same exposure to defendant A's product might not be substantial in comparison to the exposure to the other products. Such a

> result does not promote the purposes of the substantial factor test, which is aimed at alleviating the inequities that result when applying the but-for test in a multi-defendant case, not at creating such inequities.

*Id.* at 425.

Obviously, plaintiffs' cases here do not involve different asbestos manufacturers, but this case still involves the need to distinguish between different types of exposure. Importantly, there is no need to compare and weigh the types of exposure -- at least at the liability stage. The court's holding in *Tragarz* has been affirmed more recently in a case involving benzene. In *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426 (7th Cir. 2013), the Seventh Circuit held that "to show that a toxin is 'a cause' or 'a substantial factor,' [plaintiff] was not required to demonstrate that benzene exposure was the sole cause of his disease, so long as he showed that benzene contributed substantially to the disease's development or significantly increased his risk of developing AML." *Id*. at 433.

From this, the court concludes that the substantial factor test does not require plaintiffs to compare their non-occupational exposures to their occupational exposures. Still, a "substantial factor" or "substantial contributing factor" means something more than a possible cause. As the Sixth Circuit explained in *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005), "where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id*. at 492

Here, plaintiffs principally rely on expert opinion testimony to draw the link for the jury between their claimed, non-occupational exposures and their subsequent

development of asbestos-related injuries.  In turn, plaintiffs' experts Parker and Anderson principally rely on epidemiological studies of other communities in which individuals developed mesothelioma based on non-occupational exposure to asbestos -- either from general community exposure or from fibers of family members who worked in asbestos facilities, to opine that plaintiffs' non-occupational exposures were substantial contributing factors to plaintiffs' respective asbestos-related diseases.

As described in the facts section above, six of the eight plaintiffs suffered from mesothelioma, while the other two suffered from lung cancer.  This distinction is meaningful in describing the experts' support for their respective opinions on causation. As such, the court will first discuss the expert's opinions regarding mesothelioma plaintiffs, then turn its attention to those plaintiffs who developed lung cancer.

### a.  Causation Evidence for Mesothelioma Plaintiffs

For those plaintiffs who suffered from mesothelioma, the experts rely on Valérie Bourdès *et al.*, *Environmental Exposure to Asbestos and Risk of Pleural Mesothelioma: A Review and Meta-Analysis*, 16 European J. of Epidemiology 411 (2000), which is a "study-of-studies," in this case a review of eight other studies of household asbestos exposure and neighborhood or community exposure.  (Ellis Decl., Ex. G ('286 dkt. #301-7).)  From the Bourdès paper and the eight underlying studies, plaintiffs' experts identified a so-called "zone of risk" in Marshfield with the plant at a center of a circle with a 1.25 mile radius. As Parker explained, the significance of the 1.25 miles radius "is concentration, maintaining a concentration that provides you some sort of dose."  (12/3/15 Hearing Tr. ('286 dkt. #455) 178; *see also id.* at 89-90 (Anderson testifying to significance of 1.25

miles radius).)   Based on these studies, plaintiffs' experts also acknowledge that time is another necessary factor in attributing a disease to asbestos exposure.   (*Id.* at 90, 93, 178.)   Anderson testified that the relevant time in these studies about community or household exposure is at least one year.   (*Id.* at 82, 103.)

As mentioned already, both experts also rely on the Helsinki criteria for attributing a disease to asbestos exposure.   (*See* Herrick Decl., Ex. 46 ('286 dkt. #355-64) (Helsinki Criteria (1997)); Ellis Decl., Ex. P ('286 dkt. #389-2) (Helsinki Criteria (2014, 2015)).)   For mesothelioma, those criteria require "a history of *significant* occupational, domestic or environmental exposure" to attribute causation to asbestos. (Ellis Decl., Ex. P ('286 dkt. #389-2) p.2 (emphasis added).)

Not surprisingly, defendant criticizes plaintiffs' experts' reliance on these studies, arguing that neither Parker nor Anderson sufficiently compared the communities studied with the area around the Marshfield plant in opining that plaintiffs' exposure here was significant.   Of course, defendant may cross-examine plaintiffs' experts Parker and Anderson at trial on whether the circumstances during the relevant period in Marshfield were sufficiently similar to make a viable comparison with the areas surrounding the communities that experienced instances of mesothelioma based on non-occupational exposure.   In particular, defendant may challenge the experts' reliance on those studies based on the amount of asbestos at issue in those plants and the length of time during which asbestos was in use in those communities, as well as the amount and likely dispersion of its use.   (*See* Hearing Tr. ('286 dkt. #455) 23-24).)   And the jury may well reject that comparison because those experts' failed to take into consideration adequately

the differences between Marshfield and those other communities, but the court does not find that Parker and Anderson's reliance on those studies renders their testimony patently unreliable.

On the contrary, these qualified experts appear to have reasonably concluded that the Helsinski criteria and Bourdès study of studies is the best available science to draw a comparison. At minimum, this comparison suggests *some* injury if plaintiffs' lived sufficiently close to the Marshfield plant for a sufficient period of time. It is then up to the trier of fact to decide if this admittedly imperfect comparison is sufficient to constitute proof of a significant exposure.

In their submissions, plaintiffs also hint at other exposures, namely from running errands in the community, attending school, or driving past the landfills used to dispose of asbestos materials. Anderson conceded during the *Daubert* hearing that there are *no* studies that provide a basis for experts to testify about the impact of those activities, at least standing alone, and certainly none that support a finding that these activities would result in a *significant* exposure, much less render reliable expert testimony that exposure from those activities was a *substantial* factor contributing to the plaintiffs' asbestos-related diseases. (12/3/15 Hearing Tr. ('286 dkt. #455) 87.) Instead, plaintiffs' experts are left with the general proposition that any exposure is a contributing factor, which may well be true but would render the legal requirement of a significant factor meaningless. Accordingly, the court will not allow a plaintiff's claim to go forward based on these alleged activities alone.

Finally, plaintiffs point to exposure from other family members bringing asbestos fibers home from the family member's employment with Weyerhaeuser. As Weyerhaeuser argued at the *Daubert* hearing, while a number of plaintiffs put forth evidence of a family member working at the plant and coming home with "dust" on their clothing, plaintiffs fail to put forth sufficient evidence that the family member worked in the mineral core area. In fact, most of the family members worked in other areas of the plant. As such, while plaintiffs remain free to put forth such evidence at trial, the court will not allow a plaintiff's claim to proceed based on evidence that a family member worked at Weyerhaeuser alone, particularly without evidence that (1) the family member's work involved significant, ongoing exposure to asbestos or (2) for some other reason, the clothing they regularly brought home was likely to result in a significant exposure to plaintiff.

Applying this framework here, the court finds that plaintiffs' experts' opinion testimony on causation is sufficiently reliable for the following three plaintiffs, based on proof that they lived in a home within 1.25 miles of the plant for at least one year:

- Boyer, who lived within 1.07 miles of the plant from 1975 to 1979;

- Pecher, who lived at two homes approximately 0.6 mile and 0.51 mile, respectively, from the plant from 1960 to at least 1979;

- Sydow, who lived at two homes approximately 0.5 mile and 1.1 miles, respectively, from the plant from 1957 to at least the time of his deposition in this lawsuit;

(*See* discussion, *supra,* Facts § B.)

Unfortunately, for plaintiffs Masephol, Seehafer and Jacobs/Treutel, however, there is simply insufficient evidence to support the opinions of their experts Parker and

Anderson of significant, non-occupational exposure, which (as discussed) is a predicate to the expert's opinions that this exposure was a substantial factor contributing to their respective asbestos-related diseases.  Plaintiff Masephol lived outside of Marshfield his entire life.  His only evidence to support a non-occupational exposure claim comes from (1) his father's work at the plant in maintenance, without any direct evidence that his father worked in the mineral core department, and (2) his travel within Marshfield, neither of which independently or combined form a scientific basis for plaintiffs' experts to testify reliably that he had significant, non-occupational exposure for reasons already explained above.

The same holds true for plaintiff Seehafer.  The only evidence of non-occupational exposure Seehafer offers is that he lived with his brother for a few months in 1966 at an unknown address in Marshfield.  As described above, both experts testified that time is a necessary component of the epidemiological studies.  A few months living with his brother at an unknown address forms an insufficient basis from which the experts could testify reliably that Seehafer had significant, non-occupational exposure to asbestos. Seehafer also stopped at his ex-wife's house, which was within 1.25 miles of the plant, for about 10 to fifteen minutes once a week to pick up his children, which is at most comparable to running errands within Marshfield.  As explained above, there is no recognized scientific basis (or at least not one offered in response to defendant's motions here) for the experts to opine that these activities form a sufficient basis to find significant non-occupational exposure.

49

Finally, Treutel (represented by her daughter Jones) lived outside of Marshfield her entire life.  Her only evidence of exposure comes from her daughter, who worked very briefly in the mineral core department.  Unlike the other plaintiffs, this *is* evidence that a family member worked in the mineral core department, but it is also undisputed that her daughter's employment was limited to one summer.  As such, even if Treutel suffered household exposure from her daughter's clothing, she has failed to put forth sufficient evidence on the *length* of exposure for experts to testify reliably that Jacobs sustained significant, non-occupational exposure to support a jury finding that those exposures substantially contributed to her mesothelioma.

Given the limits of scientific knowledge, the court readily acknowledges the difficulty of drawing any parameters as to the minimum exposure that would permit an expert to testify reliably that an individual plaintiff sustained significant, non-occupational exposures to asbestos.  For reasons already explained, however, the science certainly requires *some* combination of quantity, regularity and proximity of asbestos exposure before it could be found "significant," unless that legal term has no meaning. Obviously, the science would support an expert's opinion of significant exposure, and by implication, an exposure that substantially contributed to contracting mesothelioma, if one were to have been bathed in asbestos just one time, worked with asbestos in an occupational setting or been exposed to asbestos over a longer period of time in a non-occupational setting.

Since the plaintiffs' non-occupational exposure to asbestos is, at best, uncertain as to quantity, regularity and proximity, plaintiffs' experts rely in part on a reasonable,

scientific-based substitute for these variables by virtue of studies suggesting that living within 1.25 miles of a plant using asbestos in manufacturing for some period of time is sufficient to presume a significant, non-occupational exposure, even if there is no evidence that anyone except someone working in the mineral core department of the Weyerhaeuser plant ever actually contracted the disease.   As discussed, however, plaintiffs Masephol, Seehafer and Jacobs/Treutel never lived within 1.25 miles of the plant; indeed, they never lived within *5 miles* of the plant.   Nor is there evidence that they experienced other, non-occupational exposures to a large amount of asbestos for a short period of time, a medium amount for a medium period of time, or a smaller amount for a longer period of time.   Accordingly, plaintiffs' experts have no reliable basis to opine that plaintiffs Masephol, Seehafer and Jacobs/Treutel's respective exposure to asbestos in a non-occupational setting was "significant" or a "substantial contributor" to mesothelioma, at least in any way supported by peer review studies or other reliable data. This is not to say that the science precludes the experts' opinion that even a small, single exposure may "contribute" to the contracting of mesothelioma, only that the science does not support a *legal* finding that only small and occasional, non-occupational exposure would *substantially* contribute to contracting mesothelioma.

Regardless, given the lack of (or at most, truly meager) scientific support for that latter proposition, the court cannot ignore the real possibility that any trier of fact might be unable to balance defendant's right to exclude liability or damages for *occupational* exposures under worker's compensation laws against the understandable, if unduly prejudicial, sympathy that would be engendered at a trial in light of the inexorable pain

and death that results from this disease.  Accordingly, plaintiffs Masephol, Seehafer and Jacobs/Treutel have failed to offer expert opinions that would support a finding of liability against defendant and, absent that, offer no other evidence that would permit a reasonable trier of fact to find liability.

### b.  Causation Evidence for Lung Cancer Plaintiffs

The bulk of the epidemiological studies -- or at least the experts' focus here -- concerns mesothelioma.  Two of the six plaintiffs, Heckel and Prust, suffered from lung cancer.  As defendant points out in its separate motion to strike plaintiffs' proffered expert opinions as to lung cancer, there are specific causation issues unique to these cases. (*See, e.g.*, Def.'s Mot. to Exclude Expert Lung Cancer Testimony ('459 dkt. #258); Def.'s Br. ('459 dkt. #259).)  Anderson points to a single study concerning lung cancer, the Kumagai study, which concerned the prevalence of lung cancer in one quadrant of an asbestos plant in Japan.  Critically, the study did *not* concern community or household exposure, at least as we understand it here.  The study found a "slightly elevated risk for lung cancer just in the men that lived in that quadrant" of the plant.  (12/3/15 Hearing Tr. ('286 dkt. #455) 81.)  Nonetheless, plaintiffs' experts rely on the same 1.25 mile zone of risk radius for these plaintiffs without *any* scientific support for its application to lung cancer patients.

Moreover, under the Helsinki criteria, the standard for attributing causation for lung cancer to asbestos is not as straightforward as the standard applied to mesothelioma:

> Pleural plaques are indicators of exposure to asbestos fibers.
> Because pleural plaques may be associated with low levels of
> exposure, the attribution of lung cancer to asbestos must be

> supported by an occupational history of substantial asbestos exposure or measures of asbestos fibre burden, [i.e.], pleural plaques alone are insufficient for the attribution of lung cancer to asbestos."

(Ellis Decl., Ex. P ('286 dkt. #389-2) 3.)

Consistent with the science then, plaintiffs Prust and Heckel must demonstrate non-occupational asbestos exposure that is comparable to that sustained in the occupational setting.  In other words, for plaintiffs' experts to rely on the Kumagai study in Japan, which after all involved exposure in a plant, there must be evidence that Prust's and Heckel's non-occupational asbestos exposures were comparable to exposure one would experience working in a plant that processes asbestos before it could be found significant and substantially contributing to contracting lung disease.

Plaintiff Prust's evidence of non-occupational exposure is limited to him living in close proximity to the plant, approximately 0.18 mile from the Weyerhaeuser plant from 1955 to 1960 (notably, it appears that only the last year would be material, since this is when the plant started using asbestos in the manufacture of doors), and living approximately 1.2 or more miles from the plant from 1963 until some unknown date. Prust also reported that he attended church and frequently visited restaurants close to the plant.

Plaintiff Heckel's evidence of non-occupational exposure is similarly limited.  She lived at locations in Marshfield from approximately 1966 to 1978, though she did not contract mesothelioma.   In addition, her husband worked in the boiler room at Weyerhaeuser in the mid-1960s, though plaintiff offers no evidence of his exposure to

asbestos, and in turn, no meaningful evidence of any household exposure on the part of Mrs. Heckel because of her husband's employment.

For both plaintiffs, this is simply an insufficient factual basis for their experts to testify reliably that non-occupational exposures were comparable to those in the occupational setting, nor that the level of exposure met any scientifically recognized level to contribute substantially to contracting lung cancer.  Accordingly, the court will strike Parker and Anderson's respective opinions on causation as to plaintiffs Prust and Heckel, and in the absence of any other evidence supporting a finding of causation, will grant summary judgment to defendant on those two cases.

## II. Motion for Summary Judgment

Much of defendant's motion for summary judgment overlaps with its *Daubert* challenge.  For the reasons explained above, certain plaintiffs have failed to put forth sufficient evidence from which a reasonable jury could find non-occupational exposure was a substantial contributing factor of plaintiffs' injuries.  Accordingly, the court will grant summary judgment to defendant Weyerhaeuser against plaintiffs Masephol, Prust, Seehafer, Heckel and Treutel.

For the other plaintiffs, the court finds that plaintiffs have put forth sufficient evidence, largely based on Parker's and Anderson's opinion testimony, for a reasonable jury to conclude that non-occupational asbestos exposure was a substantial contributor to their respective injuries.  *See Physicians Plus Ins. Corp.*, 2001 WI App 148, at ¶ 59 (explaining that causation is a "question of fact that may be decided as a matter of law

only when reasonable factfinders could not differ on the issue") (quoting *Wagner v. DHSS*, 163 Wis. 2d 318, 328, 471 N.W.2d 269 (Ct. App. 1991)).

These three, remaining plaintiffs assert four claims against defendant Weyerhaeuser:   (1) intentional public nuisance; (2) negligent public nuisance; (3) intentional private nuisance; (4) negligent private nuisance.   It is to claims against these plaintiffs the court now turns.

In *Milwaukee Metropolitan Sewerage District*, 2005 WI 8, 277 Wis. 2d 635, 691 N.W.2d 658, the Wisconsin Supreme Court set forth in great detail the various legal theories that fall within a "nuisance claim," as well as the required elements to proceed on such a claim.   "The term 'nuisance' generally refers to the invasion of either an interest in the use and enjoyment of land or a common public right."   *Id.* at ¶ 24. Accordingly, "[a] nuisance is nothing more than a particular type of harm suffered; liability depends upon the existence of underlying tortious acts that cause[d] the harm." *Id.* at ¶ 25; *see also Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2002 WI 80, ¶ 22 n.18, 254 Wis. 2d 77, 646 N.W.2d 777 ("[T]he injurious consequences resulting from the nuisance, rather than acts [that] produce the nuisance, constitute the cause of action." (quotation marks and citation omitted)).

The first step in analyzing any nuisance claim, therefore, is to identify the particular harm suffered; in other words, the interference with a private interest in the use and enjoyment of land or with a public right.   *Milwaukee Metro.*, 2005 WI 8, at ¶ 26. Here, plaintiffs allege both private and public nuisance claims.   "The essence of a private nuisance is an interference with the use and enjoyment of land."   *Id.* at ¶ 27 (quoting W.

Page Keeton *et al.*, *Prosser and Keeton on Torts* § 87 at 619 (5th Ed. Lawyers Ed. 1984)).

Such a claim may be brought by "those who have property rights and privileges in respect

to the use and enjoyment of the land affected." *Milwaukee Metro.*, 2005 WI 8, at ¶ 27

(internal citation and quotation marks omitted). A public nuisance, on the other hand, is

a "condition or activity which substantially or unduly interferes with the use of a public

place or with the activities of an entire community." *Id.* at ¶ 28 (quoting *Physicians Plus*,

2002 WI 80, at ¶ 21).

A nuisance claim may also be premised on intentional or negligent conduct. *Id.* at

¶ 33. Here, plaintiffs again claim both. In intentional nuisance claims, the Wisconsin

Supreme Court explained in *Milwaukee Metropolitan Sewage District*, "the nuisance is

created by the defendant." *Id*. at ¶ 33. For example "a tannery or a slaughter-house in

the midst of a residential area" may be a nuisance, although liability "does not rest on the

degree of care used [by the defendant] . . . but on the degree of danger existing even with

the best of care." *Id.* (internal citation and quotation marks omitted). In contrast, a

nuisance claim premised on negligent conduct involves "acts or conduct of the defendant

[that] do not necessarily cause damage to others." *Id.* at ¶ 34. In negligence nuisance

cases, "liability is predicated upon the defendant's failure to remove the harmful

condition after he has notice of its existence." *Id.*

## A. Public Nuisance Claims

Defendant's arguments in support of its motion for summary judgment on

plaintiffs' public nuisance claims largely overlap with its arguments to strike plaintiffs'

experts testimony as unreliable. Specifically, defendant argues that plaintiffs lack

sufficient evidence from which a reasonable jury could find:  (1) a public nuisance exists -
- in other words, that the surrounding community was contaminated by asbestos; and (2)
the public nuisance was a substantial contributing factor in causing plaintiffs' injuries.
With respect to the first argument, defendant specifically takes issue with the lack of
evidence demonstrating that the anecdotal complaints of "dust" contained asbestos and
lack of modeling or other attempts by plaintiffs to quantify the level of emissions.  As for
the second basis, defendant principally argues that plaintiffs cannot prove causation
because plaintiffs lack evidence of non-occupational exposures.  The court has already
considered and rejected these arguments as part of its decision on the *Daubert* motion
with respect to the three remaining plaintiffs.

Defendant also seeks summary judgment on the intentional nuisance claims --
both public and private -- on the basis that plaintiffs lack evidence that Weyerhaeuser
had "knowledge that the condition or activity is causing harm to another's interest."
(Def.'s Opening Br. ('286 dkt. #252) 14 (quoting *Milwaukee Metro. Sewerage Dist.*, 2005
WI 8, at ¶ 38).)  As the Wisconsin Supreme Court explained in a stray voltage case, "it
was not sufficient that the defendant knew some stray voltage invaded the farmer's land;
rather, proof was required that the defendant knew that unreasonable levels of the stray
voltage was causing harm to the plaintiff's cows."  *Milwaukee Metro. Sewerage Dist.*, 2005
WI 8, at ¶ 38, (discussing *Vogel v. Grant-Lafayette Elec. Co-op.*, 201 Wis. 2d 416, 548
N.W.2d 829 (1996)).

While plaintiffs give short shrift to this argument, there is evidence in the record
to find that defendant was aware of asbestos emissions into the community.  Of course,

at trial, plaintiffs will have to prove that defendant was also aware that the level of non-occupational asbestos emissions constituted a separate danger.  Still, the court will deny defendant's motion for summary judgment with respect to plaintiffs' intentional nuisance claims, finding plaintiffs have produced sufficient evidence to create a genuine issue of material fact as to whether Weyerhaeuser knew that it was releasing dangerous amounts of asbestos into the community.[19]

### B.  Private Nuisance Claims

Plaintiffs' private nuisance claims, which concern the use and enjoyment of land, prove an ill fit for at least two, related reasons.  *First*, defendant argues that plaintiffs' claims fail because (1) "[o]nly individuals with current property rights or a possessory interest in land can state a claim for private nuisance," and (2) plaintiffs have failed to put forth any evidence of a current interest.  (Def.'s Opening Br. ('286 dkt. #252) 16.)  In the face of defendant's well-crafted argument that the possessory interest must be "current," as opposed to in existence when the nuisance allegedly occurred, plaintiffs fail to offer *any* response.  Accordingly, plaintiffs have waived any opposition.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").  Indeed, the portion of plaintiffs' opposition brief concerning the private nuisance claim is not specific to any individual plaintiff.  Absent individual proof

---

[19] For this same reason, the court will also deny defendant's motion with respect to plaintiffs' punitive damages claim, though defendant remains free to renew this argument in a motion *in limine* or for directed verdict if the evidence presented during the damages phase is not sufficient for the jury to find defendant acted with an "intentional disregard of the rights of" plaintiffs. Wis. Stat. § 895.043.

of a possessory interest, it is difficult to understand how plaintiffs could rebut this argument.

The concern about the lack of evidence of a possessory interest is connected to defendant's *second* argument -- that plaintiffs' claims are barred by the statute of limitations.   Regardless of whether the three-year statute of limitations for intentional and negligent tort claims apply under Wis. Stat. § 893.54 and 893.57, or the six-year statute of limitations for damage of property under Wis. Stat. § 893.52 applies, defendant argues that the claims have long tolled, since Weyerhaeuser stopped using asbestos in 1978.

In response, plaintiffs contend that the discovery rule applies, at least under § 893.52, and their claims accrue only when "the plaintiff objectively knows or with reasonable exercise of care should have known, the cause of the injury and the defendant's part in that cause."  (Pls.' Opp'n ('286 dkt. #364) 19-20 (quoting *Allen v. Wis. Public Serv. Corp.*, 2005 WI App 40, ¶ 8, 279 Wis. 2d 488, 694 N.W.2d 420).)  As such, plaintiffs argue that their claims are timely under the discovery rule.  In other words, they did not know that there was any impact on their use and enjoyment of land. (Pls.' Opp'n ('286 dkt. #364) 20-21 ("[T]he contamination of Plaintiff's property would not have been discovered by the exercise of ordinary care.").)

While the court agrees the discovery rule is available for private nuisance claims, it would only apply when the plaintiff is aware of an injury, but does not know its cause. In the stray voltage context, for example, the plaintiff farmers *knew* that their cows were suffering; they simply did not know the source of their injury.  *See, e.g., Allen*, 2005 WI

App 40, ¶ 3,; *Gumz v. N. States Power Co.*, 2006 WI App 165, ¶ 3, 295 Wis. 2d 600, 721 N.W.2d 515. Here, however, plaintiffs are not asserting that the asbestos dust they experienced during the relevant period gave rise to an injury preventing their enjoyment during the ownership of the property, unless that injury is the dust itself damaging window sills and soiling laundry. As such, defendant's statute of limitations defense highlights again the ill fit of this claim to plaintiff's injuries: the claimed injury is not the enjoyment of plaintiff's land. Because plaintiffs lacked a possessory interest in any event, the court need not decide whether the private nuisance claim is also barred by the applicable statute of limitations.

Accordingly, the court will grant summary judgment to defendant on plaintiffs' claims of a private nuisance, and plaintiffs Boyer, Pecher and Sydow will be allowed to proceed to trial on a public nuisance claim against Weyerhaeuser.

ORDER

IT IS ORDERED that:

1) Plaintiff Sydow's second motion for leave to file a third amended complaint ('219 dkt. #440) is GRANTED. The amended complaint naming the current special administrator is due on or before March 3, 2016.

2) Defendant Weyerhaeuser's motions for summary judgment are GRANTED with respect to plaintiffs Heckel ('459 dkt. #143), Jacobs ('899 dkt. #134), Masephol ('186 dkt. #221), Prust ('143 dkt. #196), and Seehafer ('161 dkt. #203).

3) Defendant Weyerhaeuser's motions for summary judgment are GRANTED IN PART AND DENIED IN PART with respect to plaintiffs Boyer ('286 dkt. #221), Pecher ('147 dkt. #198), and Sydow ('219 dkt. #236) as set forth above.

4) Defendant Weyerhaeuser's motions to strike plaintiffs' experts are GRANTED with respect to plaintiffs Heckel ('459 dkt. #187), Jacobs ('899 dkt. #164), Masephol ('186 dkt. #300), Prust ('143 dkt. #233), and Seehafer ('161 dkt. #268).

5) Defendant Weyerhaeuser's motions to exclude plaintiffs' proffered lung cancer testimony are GRANTED with respect to plaintiffs Heckel ('459 dkt. #258) and Prust ('143 dkt. #305).

6) Defendant Weyerhaeuser's motions to strike plaintiffs' experts are DENIED with respect to plaintiffs Boyer ('286 dkt. #299), Pecher ('147 dkt. #239), and Sydow ('219 dkt. #321).

7) Defendant Weyerhaeuser's motions to strike portions of Anderson's testimony are GRANTED with respect to all plaintiffs, Boyer ('286 dkt. #302), Heckel ('459 dkt. #219), Jacobs ('899 dkt. #199), Masephol ('186 dkt. #303), Pecher ('147 dkt. #268), Prust ('143 dkt. #264), Seehafer ('161 dkt. #271), and Sydow ('219 dkt. #326).

8) Defendant Weyerhaeuser's motions to strike plaintiffs' evidence as inadmissible hearsay are GRANTED IN PART AND DENIED IN PART as described in the opinion for all plaintiffs, Boyer ('286 dkt. #399), Heckel ('459 dkt. #291), Jacobs ('899 dkt. #256), Masephol ('186 dkt. #406), Pecher ('147 dkt. #356), Prust ('143 dkt. #339), Seehafer ('161 dkt. #328), and Sydow ('219 dkt. #412).

9) Plaintiffs' motion to deem responses admitted are DENIED for all plaintiffs, Boyer ('286 dkt. #420), Heckel ('459 dkt. #304), Jacobs ('899 dkt. #262), Masephol ('186 dkt. #428), Pecher ('147 dkt. #378), Prust ('143 dkt. #350), Seehafer ('161 dkt. #334), and Sydow ('219 dkt. #434).

10) Plaintiffs' motions to take deposition of David B. Allen are DENIED AS MOOT for plaintiffs Heckel ('459 dkt. #301), Jacobs ('899 dkt. #259), Masephol ('186 dkt. #425), Prust ('143 dkt. #347) and Seehafer ('161 dkt. #331), and GRANTED for plaintiffs Boyer ('286 dkt. #417), Pecher ('147 dkt. #375), and Sydow ('219 dkt. #431).

11) Defendant Weyerhaeuser's motions for a protective order barring plaintiffs' Ehlke deposition are DENIED for plaintiffs, Boyer ('286 dkt. #309), Pecher ('147 dkt. #275), and Sydow ('219 dkt. #333), and DENIED AS MOOT for plaintiffs Heckel ('459 dkt. #222), Jacobs ('899 dkt. #200), Masephol ('186 dkt. #312), Prust ('143 dkt. #270), and Seehafer ('161 dkt. #272).

12)     Plaintiffs' motions to file a sur-reply in opposition to defendant's motion for a protective order are DENIED AS MOOT for all plaintiffs, Boyer ('286 dkt. #358), Heckel ('459 dkt. #249), Jacobs ('899 dkt. #226), Masephol ('186 dkt. #363), Pecher ('147 dkt. #315), Prust ('143 dkt. #298), Seehafer ('161 dkt. #298), and Sydow ('219 dkt. #372).

13)     The clerk of the court is directed to enter judgment in defendant Weyerhaeuser's favor in Heckel (13-cv-459), Jacobs (12-cv-899), Masephol (14-cv-186), Prust (14-cv-143), and Seehafer (14-cv-161).

14)     The Clerk of Court is directed to close Masephol (14-cv-186), Prust (14-cv-143), and Seehafer (14-cv-161).

15)     Plaintiffs Heckel (13-cv-459) and Jacobs (12-cv-899) may have until February 29, 2016, to advise the court as to the status of their claims against the other named defendants in their respective cases.

Entered this 19th day of February, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge